The next case on the calendar is China Shipping v. Big Port Service. Good morning. May it please the Court, I'm Peter Skoufalos with the firm of Brown, Gavalis and Prom and we represent the big port services in this case. A preliminary point, this Court has considered several cases involving the OW bunker bankruptcy and has ruled on the maritime lien in favor of a bunker supplier when intermediaries like OW bunker were involved in the transaction. And yes, this case does involve OW bunker, but this is not one of those OW bunker type cases. The current case concerns whether the appellant was permitted to pursue an arbitrable in personam claim against the appellee CSCL, the ship owner. We supplied fuel in excess of a million and a half dollars to that vessel. We've never been paid and we took certain steps to collect that money. And so that's what the Court addressed here. It addressed what happened in Singapore as part of our efforts. Well, can we just sort of start with the jurisdictional issue? It seems to me your reply brief you sort of pivoted a bit and you're arguing there that we should be reexamining our holding guarantee or guarantee, however you pronounce it. What I think, what I was trying to get at, we should, that the Court should examine its decision in the guarantee case on subject matter jurisdiction. That was the issue I was bringing up. So is that implying that that case pretty much decides the jurisdictional question here unless we reexamine it? Yes, that's correct. So our brief began on the jurisdictional, on the threshold question of subject matter jurisdiction and we suggested that the Court should reexamine the guarantee financial second circuit decision for two reasons. One is that guarantee says that one should look at what the party opposing declaratory judgment would have been able to do in a coercive suit. And if that suit would support federal subject matter jurisdiction, then the declaratory judgment plaintiff has, can rely on federal subject matter jurisdiction. We argue that our case never involved a coercive suit. We never had a coercive suit using the terms of an arbitrable claim that sounds in maritime, a distinction that I think brings us outside of the square holding of the guaranteed decision. The second thing is, and this Court recognized that in guarantee there's a facial illogic to having a declaratory judgment plaintiff found contract subject matter jurisdiction on a contract that it actually disavows. And so we have said and argued in our brief that in the cases such as this very one where the appellee says there's no such contract, it seems illogical, even looking at the guarantee court, to then allow that plaintiff. Yes, I don't understand that. If you had brought an action to compel arbitration, if you'd been the first to court, we would look through the petition to the underlying contract and say this is a maritime contract, and that's a basis for subject matter jurisdiction. And that's what guarantees. I guess I'm just not understanding what's illogical about doing our usual practice in the of reversing the party's position on declaratory. Well, the first position was that we don't have a substantive federal claim. We had an arbitrable claim in maritime. The second position is really whether the mirror rule ought to apply in a circumstantial circumstance where a plaintiff, where the declaratory judgment plaintiff disavows the underlying contract. And we cited, for example, the NASDAQ Second Circuit case where that issue came up, but there was no issue about the existence of a contract. All that was at issue in that case was the scope of the arbitrable issues. But I'll move on because there are multiple issues that I wanted to address beyond the subject matter jurisdiction. The court had to first recognize the Singapore court decisions under principles of comity and before it could apply the collateral estoppel principles that the district court eventually applied. Now, we have argued multiple times that when we went to Singapore in this case, we did so only to invoke the provisional remedy of in rem arrest to secure the in personam arbitrable claim against the appellee. So we filed an action in Singapore invoking the Singapore court admiralty rules. The action was an admiralty action in rem. We issued a writ of summons in rem for admiralty. And all that the Singapore courts ruled ultimately was that that action could not survive under Singapore law and applying the Singapore law of agency. So it said no agency was relationship was formed such that a party with authority to bind the vessel, bound the vessel. They threw out our in rem action after multiple hearings, even up to the court of appeal ultimately on this case. But the Singapore court of appeals, and this is a key point, said in affirming the lower court's dismissal of your in rem action, we stress that our view in this regard is not intended to be a comment on the viability of the plaintiff's claim, my client's claim, in arbitration proceedings overseas. And we view that as really as an express carve out of what the Singapore courts held. So in bottom, our position on comedy is that, yes, we accept that district courts under principles of comedy may recognize foreign judgments. No dispute on that point. But we think the district court went too far in recognizing the Singapore court's findings. But didn't you in front of the district court on the motion to either dismiss or stay the If the high court decides that the dispute is not arbitrable, then China shipping would not be forced to arbitrary. That's true. That goes to the issue of judicial judicial estoppel. Judge brought up. But I mean, that's a perfectly appropriate question in this context. The answer to that is the Singapore court did not rule on whether appellants in personam claim against the appellee was arbitrable. Ultimately, it was deciding arbitrability only because it was a provision of the of the general terms and conditions that we said applied in this case, including the right to arrest the vessel in rem. So we looking moving on to judicial estoppel, we don't see that our position that we took with the district court in 2015 was indeed ultimately inconsistent because we always argued that our in personam claim ought to be heard here in New York pursuant to New York arbitration clause. Can I just go back to the question of how the that last line in the opinion of the Singapore court, I mean, I read that as a statement of modesty on the part of the Singaporean court to simply say, far be it from us to tell some other court in some other country how their preclusion rules work. You know, we'll decide our case, but, you know, if you go to New York or London, whatever, they'll decide their choice of law, and they'll figure it out. But I don't understand if the argument is that that Singapore's court was allowed to tell us how our preclusion law works and what we're allowed to give preclusive effect to or not, because I think what they said is true. They've got no power to tell us how we're going to decide preclusion. It's up to us. And the district court looked at it and applied the preclusion rules and didn't just say, well, Singapore told me that I must grant comedy, because that would be wrong. Figured out for itself whether comedy should be granted, and under normal principles, it granted it. What's wrong with that? I guess isn't that the reading of the why are we focusing on that last line of the court? Of course, they can't tell us what to do. Sotomayor, I see the point you're reading, and certainly that is an available construction of that language. But keep in mind that at that point in time, an arbitration had already been commenced in New York. There was a panel formed. The district court was aware of that proceeding already. She stayed, the judge stayed the New York  judicial economy grounds, said let's not waste our time here while Singapore is deciding. So I think the district court, the Singapore Court of Appeal understood that there was an ongoing proceeding. Now, the question for the district court to have decided was, okay, I've got the ruling in Singapore. Should I allow this impersonum claim to go forward? And that really involved a section 4 FAA issue. One party demands arbitration. The other party disputes arbitration. What happens in that case? Either the judge decides that, or we have a hearing, or the parties file competing summary judgment motions. But the district court did neither of those. It simply applied collateral estoppel principles far too broadly, we claim, because the district court, the Singapore courts did not go as far as to shut down our already-filed impersonum claim. But the Singapore court did address the issue as to whether there was an enforceable arbitration agreement between the parties, right? They were looking at it more in the kind of the arbitration was not a an important issue in the Singapore proceedings, Judge Sullivan. What was important to them was the question of agency. That's what the decision, and that's what we find. If you look at our brief, we cite several points in our brief in which the sort of the head notes of the Singapore decisions are emphasized, and they all deal with the question of agency, specifically whether this intermediate OW entity was acting as an agent for the Singapore or the ship owner which received the bunkers. And that's what the case turned on. We, the appellant, were trying to impose our general  Alitono, I think I'm reading from the appendix at 608-609, that the high court concluded that BPS failed to show the existence of an agreement between the two entities, right, and therefore failed to show that they were parties to the arbitration agreement. That was a finding of the Singapore court, wasn't it? That's correct. And why isn't that the exact issue that was going to be argued in front of the district court here? The question of arbitrability, and the reason for that, Judge Sullivan, is because the Singapore court looked at a much narrower set of facts. It didn't look at a whole host of facts that we've outlined in our brief, which would have led a trier of fact to determine whether there was additional facts that would have led to a contract formation question. Those facts included pre-fueling communications between my client and the ship owner, pre-fueling instructions going back and forth between the parties, a bunker receipt signed by the ship owner. I'm sorry. I'm going to interrupt you for a second, because I hear you arguing, I think, not in response to Judge Sullivan's question, which was, was the issue decided, but I think you're now arguing it may have been decided, but it wasn't done fairly because they didn't consider enough facts. So could you just go back to the question I think Judge Sullivan asked? I'm familiar. Was it decided? I'm familiar with that portion of the record in the Singapore that Judge Sullivan read. But was it decided? Was the arbitrability issue decided? But arbitrability was not an issue in the Singapore court proceeding. So you're saying it was not decided? It was not a key. In other words, it was not a key. I'm not asking whether it was key or the best or the most important, but was it decided? In my view, the arbitrability of our claim, Judge Nardini, was not decided in the Singapore proceedings, to answer your question directly. What was decided was whether an in rem action could proceed to secure our impersonum claim in New York on the basis of an agency theory on Singapore law. And if there's no agency, there's no agreement, and if there's no agreement, there's no arbitration, right? That's correct. Without deciding one flow from the other necessarily. Without deciding other facts that would have led a trier fact, say, in a Section 4 FAA hearing to conclude that a contract was indeed formed. You're saying they were wrong. I'm not saying they didn't have wrong. I'm not saying they're wrong. I'm saying they didn't look at those facts. Right. Okay. So you're saying they decided it necessarily, implicitly or logically, but they ought not to have because had they looked at more facts, they would have come out the other way. And that those precise, yes, that's correct. And those facts would indeed have been, would have indeed been exposed in a, in the appropriate form here in New York. A judge, the district court, allowed the appellant the opportunity to make out its claim in the form of a petition to compel arbitration. Isn't that a very different argument? That's not an argument that says the issue wasn't necessarily adjudicated in Singapore. It's saying it may have been adjudicated in Singapore, but it was done so in a way that was unfair according to whatever standard that then therefore ought not to be accorded comedy. That seems to me to be a very different argument from saying they didn't decide it. It's just saying they did decide it, but they did a bad job of it, and we should have no respect for it. Well, I — what we're saying is that the scope — what I'm saying, Judge, is that the scope of the Singapore courts was much narrower. It wasn't looking broadly as to all — as to whether all possible claims of the petitioner would be arbitrable. They were looking — That's not what you argued to Judge Torres when you were seeking a two-year stay of the district court action here. We didn't — the timeframe, of course, was not — No, no. But what you told Judge Torres was that Singapore was going to resolve it. Singapore is where it ought to be. And once Singapore decides, there's nothing for you to decide, Judge Torres. Yes, but the Singapore court did not decide arbitration, ultimately, Judge. And also, the cases that involve collateral estoppel principles usually involve a case in which the court has relied on a representation and entered a judgment in favor of one party, with that party subsequently going back to the court and taking a completely inconsistent — so we never — Judge Torres never entered a judgment. She simply stayed the action on judicial economy grounds. And as we stress, the district court ultimately did not rule on the question of — or the Singapore courts did not ultimately rule on that question. And indeed, as we've noted, have carved that out. The last — You should have known that you weren't meaning what you really were saying to her. Pardon me? You should have known that you didn't really mean what you were saying when you told her that the Singapore court was going to resolve this issue. Well, it wasn't me that uttered the words to her. It was prior counsel. But I think what was happening in Singapore was not possible to be discerned at that point in time. We didn't know the scope of what would happen in Singapore, obviously, two years prior to the proceedings over there. Keep in mind, Judge Sullivan, that we actually moved to stay the Singapore proceedings immediately. We wanted to get our in-rem security, as is provided, and then we moved to stay the Singapore. We didn't want to proceed with a full-blown hearing on agency law and so on. We wanted to stay because — I'm not quite as clear what you said to Judge Torres, at least. So go ahead. So that was the point that we were trying to make. The last point is on the propriety of the permanent injunction that the court ordered. The federal arbitration — I'm sorry, Judge Livingston? So we reserve two minutes of rebuttal. Do you want to use some of that? Yes, I will, and I will do that at this point and reserve two minutes. Thank you. Thank you. Good morning, Your Honors. Gina Venezia here for China Shipping. The district court committed no error and certainly no abuse of discretion, which is the appropriate standard, when the district court recognized the decisions of the Singapore courts. That decision, those decisions of the Singapore courts, were issued after extensive litigation and participation by the parties. Could you address the argument that the focus of the Singaporean courts was on the issue of agency and that the issue that is now — was now before the Southern District of New York wasn't fully decided? Absolutely. So there's a couple of points to that, Your Honor. Number one, the reason why the Singapore court considered an agency theory would — because that was the only legal theory advanced by Big Port in support of its argument that Big Port and my client had a contract, the only theory. Counsel here said, well, there was additional evidence that they didn't consider, and he referred to pre-supply correspondence. He referred to a bunker delivery note. That was considered in Singapore. It was submitted in Singapore. And if you look at the record, it's in record pages A528 to 543. That is the declaration of China Shipping's Singapore counsel who submitted to the district court all of the submissions that were made in Singapore, and he also  Now, contrary to his declaration, we hear nothing from Big Port's Singapore counsel. Nothing. And that's telling. You don't hear anything from Big Port's Singapore counsel because what — many things that were just said to Your Honors is simply not true. Agency was considered. That was the only legal theory advanced. The evidence that they cite, it was considered. Now, the notion that the Singapore case was limited to an in-rem action only for And I'm going to tell you why. Counsel says that because it wants to leave this Court with the impression that an in-rem proceeding in Singapore is similar to an in-rem proceeding over here in the United States. As Your Honors may know, that in the United States, an in-rem proceeding is a very particular type of proceeding. It's a case when the defendant is the vessel, and it's a case when there is a claim against the vessel itself. I direct you to the complaint — I'm calling it the complaint just to make it easier — that was filed by Big Port in Singapore. It's at A544 to 548. Yes, the action was initiated in Singapore as an arrest, but that was no in-rem proceeding. The defendant in the case in Singapore was the ship owner. The claim in Singapore was an in personam contract claim. It was a money damages claim. It was a money damages claim in personam against the ship owner. Now, China Shipping had to post the security because, right, they start security. That complaint, again, A44 to — A544 to A548, read it. It doesn't reference arbitration. It doesn't reference security. It was after Big Port had initiated the case in Singapore, after we had posted security, after we had said there's no agreement between the parties. I mean, after — once they got the security, then they demand arbitration. Then they go to the Singapore court and say, wait, hold up, hold up, hold up. We don't really want to litigate here. We are asking you to direct them to arbitration. At that point in time, my client had already appeared in Singapore and had taken the position, not only do I not have an arbitration agreement with Big Port, I have no contract whatsoever. Meanwhile, Big Port, though, continues to advance over here in the States. It appoints an arbitrator. It appoints a second arbitrator. They appoint a third arbitrator. Those arbitrators set hearings in arbitration. Meanwhile, the parties are litigating in Singapore. We were compelled to come here to stop that arbitration because the Singapore courts, to your point, Your Honor, were not going to tell a New York panel that if it convened, you must stop. So we came here. We come here and we tell — ask the district court for an injunction preventing them from proceeding with the arbitration. What do they do? They go in front of the district court, and they say a couple of things. You've already pointed out this. They say to the district court, the issue of arbitration is before the Singapore court, directly contrary to what we hear today. They tell the district court Singapore is the proper venue for the dispute. They tell the — they tell the district court Singapore undisputably has jurisdiction over the parties. And then they tell the district court Big Port is going to abide by the result in Singapore. If Singapore says no arbitration agreement, no harm, no file to China Shipping, we won't force them to proceed to arbitration. So the parties continue on in Singapore. Counsel says that the issue in Singapore was limited. Not true. The sole issues in Singapore were, is there a contract between the parties? And if — and the Big Port agreed to the Singapore court. If you decide, Singapore court, that there is no agreement — I mean, excuse me, no contract between the parties, it follows that there's no arbitration agreement. Big Port agreed to the Singapore court that that was the issue they were to decide. Big Port loses at the quarter-first instance. Big Port loses at the — at the appellate level on both their application to — to force us to arbitration and also our application to strike the complaint. We'll call it the complaint just to be easier. Our application in Singapore to strike the complaint on the basis there's no agreement between the parties. They lose both of those. They lose it at the quarter-first instance. They lose it at the appellate level. Now, the way appeals work in Singapore is once you lose at that appellate level, to go to the next level, the court of appeal, which is the apex court, similar to our Supreme Court, you have to ask for permission. Now, the way it works in Singapore, though, you first have to ask permission to the — the initial appellate court. It would be the same if, over here, we'd have to ask Your Honors for permission to go to the Supreme Court before asking permission to the Supreme Court. So Big Port requests permission at the high court, the appellate division, so to speak, of the high court. I would like permission to appeal the ruling on the arbitration application and also on their — China Shipping's application to strike the complaint. That permission was denied at the high court level. So then the next step is you go to the highest court and you ask for permission there. When Big Port went to that next step, it only asked for permission to appeal the arbitration ruling. The court of appeal said no. Later, after the time had expired, Big Port goes to the court of appeal and asks the court of appeal for permission to appeal out of time the decision by the Singapore courts to strike their complaint on the basis that there was no evidence of an agreement between the parties. It was in that context that the court of appeal said — and this was in a minute — minute entry. It's called a minute sheet, actually. And it's at A840-844. It is a minute sheet that sets forth the appearance of the attorneys in front of the court of appeal when they were — when Big Port was seeking permission to appeal out of time the decision striking at the complaint. And it was in that context that the court of appeal made the statement that their decision not to grant Big Port leave was not a comment on the viability of the overseas arbitration proceedings. Our Singapore attorney, who was present at that hearing, indicated in his declaration, which, again, is in the record, 528 to 543, explained that that statement was made because Big Port's counsel told the Singapore court, you should know we have a pending arbitration. And so it was exactly the point that Your Honor raised. The court of appeal was simply saying, we're not going to intrude on whether that body should decide whether to give effect to our judgments or not. It's not our province. That's the precise reason why we had filed a declaratory judgment, because the Singapore courts are not going to intrude on the process. They leave it to the foreign body to make the assessment of what impact, if any, their rulings have. And that is precisely what the parties here contemplated. That is why the case was stayed for two years. That is why the parties repeatedly kept notifying the district court, this is what's happening in Singapore, this is what's happening in Singapore, because what was happening in Singapore was precisely the issue that was before the district court here. And the parties agreed, let's And then there will be an assessment of what the impact of that is. The description that you heard today is simply not true. I would like to say one quick point, though, about the subject matter jurisdiction. I think counsel correctly conceded that Guaranty answers the question. And unless there is a reason to revisit Guaranty, there should be no question that it's subject matter jurisdiction. Now, he suggests that Guaranty should be revisited, but we never quite hear why. We never quite hear why. Why is it unfair to apply Guaranty? Counsel says, well, this is different because I never had a claim I was going to pursue in federal court. That was exactly the same fact pattern in Guaranty. Guaranty is on all fours. Guaranty involved a bunker supplier trying to drag a shipowner into arbitration on the basis of an alleged contract between the third party and the bunker supplier. It was the exact same fact pattern. Counsel says the mirror principle shouldn't apply. Doesn't really ever say why. In the papers, we hear, well, this is a maritime case. I submit to you that because this is a maritime case, that's precisely why the mirror principle applies here. Even our founding fathers recognized that maritime matters, maritime issues rest with the Federal courts. And the reason why is because it's international in scope. There's a need for uniformity. And so I submit to you in this case, you have a foreign shipowner, a foreign flag vessel, a foreign supply, a foreign bunker supplier, and to suggest that that foreign shipowner, who is being dragged in Singapore, in the U.S., on a contract with a bunker supplier that shipowner maintains does not exist, to suggest that that foreign shipowner is to go to State court is, quite frankly, ludicrous. The Court had subject matter jurisdiction. The issue has been decided. There was no abuse of discretion. The decision should stand. Thank you. Just a few quick comments. You heard Ms. Venezia say something that I think resonates. She said, when we went to the Singapore courts, we were not dealing with arbitration. And that's correct. That was not an issue before the Singapore courts. We didn't go there to The issue of arbitrability has always been here in New York. And I think that's an important point. And indeed, as I mentioned before, in response to Judge Sullivan's question, we sought to get out of the Singapore courts so we could come back here to New York to arbitrate. So what we told Judge Torres was, if that issue is decided in Singapore squarely, then we'll abide by it. But that issue wasn't squarely decided by the Singapore courts, at least in our view it wasn't. In terms of the carveout by the Court of Appeals, only they know precisely what they meant. But I think at a minimum it meant that the question of arbitrability ought to be looked at anew, or at least was available to the district court to be looked at anew. Instead, Judge Torres took the holding of the Singapore court and recognized it way more broadly, far more broadly than it should have been, because indeed the district courts, the Singapore courts' decisions were far more narrow. On the question of a permanent injunction, as the Court knows, Section 3 and 4 of the FAA does not expressly authorize a court to stay arbitrations as opposed to staying an action where an arbitration applies. But this Court has held that a court does have that power where the court has determined that a valid arbitration agreement does not exist. Here, the district court made no such findings. She simply proceeded to issue a permanent final injunction without making an independent finding as to the existence, which we have argued throughout she should have done under Section 4. And this being a permanent injunction, she really needed to make a finding in the court, the district court, of a clear showing that the appellee was entitled to a permanent injunction. And respectfully, we don't think the district court failed to make that necessary clear showing. So for these reasons, we respectfully request that the Court reverse the judgment of the lower court and either on subject matter jurisdictions dismiss the petition or remand on questions of arbitrability. Thank you very much for your time. Thank you both. That's the last case on the calendar for this morning, so I'll ask the clerk to adjourn court.